Judith A. Lockhart, Esq.
Andriy R. Pazuniak, Esq.
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York 10005
Telephone: (212) 238-8603
Facsimile: (212) 732-3232
lockhart@clm.com
pazuniak@clm.com
*Attorneys for Balance Point Divorce Funding, LLC*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BALANCE POINT DIVORCE FUNDING, LLC,

     Plaintiff,

v.

TIMOTHY D. SCRANTOM, JURIDICA CAPITAL MANAGEMENT LIMITED, JURIDICA CAPITAL MANAGEMENT (US) INC., and JURIDICA INVESTMENTS LIMITED,

     Defendants.

---

Index No. 13-cv-01049 (PKC) (SN)

AMENDED COMPLAINT
AND JURY DEMAND

Plaintiff Balance Point Divorce Funding, LLC ("Balance Point" or "Plaintiff"), by its attorneys Carter Ledyard & Milburn LLP, as and for its complaint against Defendants Timothy D. Scrantom ("Scrantom"), and Juridica Capital Management Limited ("JCML"), Juridica Capital Management (US) Inc. ("JCMUS"), and Juridica Investments Limited ("JIL") (collectively, "Juridica"), alleges as follows:

## INTRODUCTION

1.  This is an action for tortious interference with contract, tortious interference with business relations, and misappropriation of trade secrets. These claims arise out of Defendants' successful efforts to cause a breach of the contractual relationship between Scrantom's ex-wife,

7167843.6

Lila Masters ("Masters"), and Balance Point, to interfere with Balance Point's business relationships, and to obtain Balance Point's confidential and proprietary trade secret information. As a direct result of litigation threats and other actions designed to interfere with Balance Point's contractual relationship with Masters and its business relationships with investors, Masters breached her contract with Balance Point and Balance Point suffered damages in an amount to be proven at trial, but in excess of $1,000,000, and suffered additional monetary damages as a result of having to disclose the litigation threats to a prospective investor.

## PARTIES

2. Plaintiff Balance Point Divorce Funding, LLC is a limited liability company organized under the laws of the State of Nevada with its principal place of business at 9595 Wilshire Boulevard, Suite 900, Beverly Hills, California, 90212. The sole member of Balance Point is Stacey Napp ("Napp"), who is an individual domiciled in the State of California.

3. Defendant Timothy D. Scrantom is an individual domiciled in the State of South Carolina. Scrantom co-founded JIL and JCML, and was General Counsel of JCML, a member of the JCML Executive Committee, a Director of JCML, JCMUS and JCMUK, the President of JCMUS, a consultant for JCML, and a shareholder of JCML.

4. Defendant Juridica Capital Management Limited is a corporation organized under the laws of the Bailiwick of Guernsey with its principal place of business at Bordeaux Court, Les Echelons, St. Peter Port, Guernsey, GY1 6AW. JCML arranges capital and provides claim risk transfer and mitigation strategies and financial products to lawyers, law firms and businesses through its management of JIL. JCML also partners and co-invests with other leading financial institutions and insurers in London and New York.

2

7167843.6

5. Defendant Juridica Capital Management (US) Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 65 East 55th Street, 23rd Floor, New York, New York, 10022. JCMUS is a wholy-owned subsidiary of JCML. Upon information and belief, JCML operates in the United States through JCMUS.

6. Defendant Juridica Investments Limited is a closed-ended investment company under the laws of the Bailiwick of Guernsey with its principal place of business at Bordeaux Court, Les Echelons, St. Peter Port, Guernsey, GY1 6AW. JIL was co-founded by Scrantom and utilizes the services of JCML and JCMUS for investment management and advisory services.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over Scrantom because he engaged in continuous, permanent, and substantial activity in New York by founding and operating two litigation funding companies with principal places of business in New York and frequently traveling to New York to conduct business. Furthermore, this action arises out of and is related to tortious conduct Scrantom committed primarily within the State of New York.

9. This Court has personal jurisdiction over JCMUS because it has its principal place of business in the State of New York.

10. This Court has personal jurisdiction over JCML because it is engaged in continuous, permanent, and substantial activity in New York. Upon information and belief, JCML uses the New York offices of JCMUS to conduct substantial business in New York.

3

Furthermore, this action arises out of and is related to JCML's business activities with Scrantom in the State of New York.

11. This Court has personal jurisdiction over JIL because, upon information and belief, JIL is engaged in continuous, permanent, and substantial activity in New York. JIL has and continues to provide litigation financing for a significant number of claimholders in New York, and markets itself as a litigation financing company in New York. Furthermore, this action arises out of and is related to JIL's business activities in the State of New York.

12. Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this action occurred within the Southern District of New York. JCMUS has its principal places of business in New York City and a substantial part of the tortious conduct giving rise to this action occurred in New York City.

## FACTUAL ALLEGATIONS

13. Balance Point provides litigation funding and support to financially disadvantaged parties in divorce proceedings and seeks to eliminate the inherent and unfair imbalance in cases involving one financially secure partner and one partner with limited financial resources. Balance Point provides financing to pay for, *inter alia*, attorney fees, forensic accounting fees, investigator fees, and, if necessary, reasonable living expenses.

14. Juridica is engaged in the business of providing third-party litigation funding and is well known in the litigation-funding market. Scrantom co-founded JIL and JCML and, until October 2010, held a number of positions, including General Counsel and Director of JCML and President of JCMUS. Scrantom is a prominent figure in litigation funding and is well-known for his involvement with Juridica. Upon information and belief, Scrantom is an actively licensed attorney in two jurisdictions and barrister-at-law in multiple jurisdictions.

15. On October 25, 2010, Scrantom resigned from his management positions with Juridica, but continued to be a shareholder. Scrantom became a "strategic consultant" for Juridica and held that position until December 31, 2012. Upon information and belief, Scrantom continued to have significant involvement with Juridica during that period. Scrantom testified in the Fall of 2011 that he continued to exert "control" over Juridica after his resignation and influenced Juridica's day-to-day operations and long-term business strategies.

16. On or around April 20, 2011, Scrantom formed BlackRobe Capital Partners LLC ("BlackRobe"), which is also engaged in providing third-party litigation funding. Scrantom testified that Juridica and BlackRobe are not direct competitors.

17. In or around May 2011, Masters contacted Balance Point in order to obtain financing to cover the going forward legal fees and expenses she would incur in connection with her divorce from Scrantom. Masters entered into a funding agreement with Balance Point, pursuant to which Balance Point agreed to provide Masters financing and Masters agreed to pay Balance Point a percentage of Masters' divorce settlement with Scrantom.

18. Balance Point and Masters executed several agreements in connection with their arrangement, including:

   a. A Purchase Agreement dated May 18, 2011 (the "Original PA"), pursuant to which Masters assigned to Balance Point a 5 percent interest in her Marital Asset Claims asserted in the Divorce Proceedings in exchange for providing financing to cover the costs of a deposition in the Divorce Proceedings.

   b. A September 29, 2011 Amendment to the Original Purchase Agreement (the "Amended PA"), pursuant to which Balance Point agreed to pay up to $310,435 to fund Masters' Divorce Proceedings in exchange for a 25 percent interest in the

7167843.6

    aggregate Marital Asset Claims. The Original and Amended PA (collectively, the "PA") also required, *inter alia*, that Masters fully cooperate in the prosecution of her claims in the Divorce Proceedings, and allowed Balance Point to take out a life insurance policy on Masters.

    c. An "Irrevocable Payment Instruction and Power of Attorney" ("Payment Instructions") included in the PA, pursuant to which Masters agreed that all payments resulting from a divorce settlement or judgment in the Divorce Proceedings would be directed to Masters' attorney, not her.

    d. A first Confidentiality Agreement, executed by Masters and her attorney on April 27, 2011, pursuant to which Masters and her attorney agreed not to disclose the terms and conditions of any purchase agreement with Balance Point.

    e. A second Confidentiality Agreement, executed by Masters and another one of her attorneys on September 19, 2011, pursuant to which Masters and her attorney agreed not to disclose the terms and conditions of any purchase agreement with Balance Point.

19. Pursuant to the terms of the PA, Balance Point provided Masters with more than $310,435 cash to finance the legal fees and expenses that she incurred in connection with her Divorce Proceedings.

20. Scrantom learned that Masters had entered into a funding agreement with Balance Point. Thereafter, Scrantom, who believed that Balance Point was a competitor of Juridica, engaged in a concerted effort to improperly interfere with Masters' contractual relationship with Balance Point to harm Masters and Balance Point and to obtain Balance Point's confidential and proprietary information and trade secrets.

21. In taking certain actions to interfere with Balance Point's contractual and business relations, Scrantom repeatedly represented himself as someone authorized to act on behalf of Juridica.

22. After learning that Masters had entered into a funding agreement with Balance Point, Scrantom repeatedly claimed to Masters and Balance Point that Juridica would initiate litigation against Balance Point. Upon information and belief, Scrantom's threats were designed to dissuade Balance Point from pursuing its interest in any settlement in the Divorce Proceedings, which would include stock and other rights related to Juridica, to convince Masters to breach her funding agreement with Balance Point, to harm Balance Point's business relations and to obtain Balance Point's confidential and proprietary trade secrets.

23. During a deposition in the Divorce Proceedings on October 6, 2011, Scrantom testified that it was improper for Masters to be "involved with" Balance Point, because Balance Point was a "competitor" of Juridica. Scrantom further testified that Juridica had examined divorce cases, and that he personally reviewed "several" family law cases for Juridica, which made Balance Point a competitor.

24. Scrantom testified that Master's had provided Balance Point with a significant amount of Juridica's confidential and trade secret information and threatened that Juridica would sue Balance Point for "[u]nfair competition and various other torts," despite knowing that any such claims were entirely meritless.

25. In December 2011, Scrantom again threatened Balance Point, this time directly, with harassing litigation. On December 1, 2011, Scrantom sent an email to Balance Point and asked if Balance Point's attorney could accept service on behalf of Balance Point.

26. On December 8, 2011, Scrantom encountered Masters in an airport and told her that "Juridica was going to sue Balance Point" unless Masters instructed her divorce attorney to negotiate a settlement with Scrantom's divorce attorney.

27. At no point did Scrantom indicate that litigation would be brought by him, but always claimed that Juridica was going to sue Balance Point.

28. At the time, Balance Point was involved in negotiations with Asta Funding, Inc. ("Asta"), a prospective investor, to receive an infusion of capital. Scrantom knew that Balance Point would have to disclose the threats of litigation to any prospective investors or equity funding partners, and that it would have a negative impact on Balance Point's ability to obtain favorable funding terms. Upon information and belief, the threats of litigation were designed to dissuade Asta from investing in Balance Point.

29. Even though Balance Point believed that the threats of litigation were baseless, given that litigation by Juridica had been threatened against it, Balance Point was obligated to and did disclose the threatened litigation to Asta in December 2011.

30. The disclosure of the threatened litigation directly and negatively impacted Balance Point's negotiations with Asta. The fact that Asta believed that Juridica, a public company, had threatened litigation against Balance Point caused the litigation threats to have a greater impact on Asta's decision to alter its investment offer to Balance Point. Prior to Balance Point disclosing the threatened litigation, Asta and Balance Point were on the verge of finalizing an arrangement in which the investor would provide a $50 million line of credit and $1.5 million in operating capital. After Balance Point disclosed the threatened litigation, the deal fell through and Asta substantially altered the proposal and offered much less favorable financing terms. Rather than offering a $50 million credit line, Asta only offered Balance Point the ability to draw

8

on $5-million tranches and only if certain contingencies were met. Asta also reduced its offer to provide operating capital from $1.5 million to $1 million.

31. The favorable financing arrangement with Asta would have closed in December 2011, but for Balance Point disclosing Scrantom's threats of litigation. As a direct and proximate result of the disclosure, Asta declined to close in December 2011 and the parties entered into prolonged re-negotiations as a direct result of Scrantom's baseless threats of litigation by Juridica.

32. In an effort to satisfy Asta and to regain the more favorable terms that had been offered in December 2011, Balance Point's counsel wrote to Juridica to obtain confirmation concerning the litigation threats. In a letter dated April 13, 2012, Balance Point's counsel notified Juridica that Scrantom, acting on behalf of Juridica, repeatedly threatened to sue Balance Point. Juridica, however, did not respond, otherwise refute Balance Point's claims or offer assurances that it did not intend to sue Balance Point. Accordingly, based on its inaction, Juridica caused Balance Point and Masters to believe that Juridica had authorized Scrantom to initiate litigation against Balance Point on its behalf. Without any assurance from Juridica, Asta would not revisit its previous deal terms.

33. The negotiations with Asta continued until mid-May 2012, by which time Balance Point incurred approximately $95,000 in additional legal fees that it otherwise would not have incurred.

34. After the deal finally closed and the financing arrangement was announced in a press release, Masters forwarded the press release to Scrantom via email. In her email, Masters stated, "Note the May 2012 venture agreement. It seems that any **threat** from you didn't stop [Napp] from entering into this" (emphasis added). Masters' email implied that Scrantom knew

9

that Balance Point was in the process of negotiating the equity funding arrangement with Asta and intended to interfere with it.

35. Along with the threats of litigation, Scrantom repeatedly contacted Masters during and after the Divorce Proceedings in order to interfere with her contractual relationship with Balance Point and her divorce attorneys. Upon information and belief, Scrantom convinced Masters that she would get a better settlement from him if she breached her contracts with Balance Point and her divorce attorneys because eliminating payment to Balance Point and her lawyers would allow Masters and Scrantom to retain more of their assets than they would otherwise have been able to do.

36. Unbeknownst to Masters' divorce attorneys and Balance Point, in April 2012, Scrantom began negotiating a divorce settlement directly with Masters. In an email dated April 14, 2012, Scrantom sent directly to Masters a revised divorce settlement proposal, which indicated that Masters would receive $5,173,000 in assets from Scrantom.

37. Four days later, on April 18, 2012, Masters and Scrantom executed a Property Settlement Agreement (the "Divorce Settlement"). Upon information and belief, Masters was entitled to receive marital property worth at least $4,310,000 as a result of the Divorce Settlement. Furthermore, Masters was entitled to receive 102,091 shares of JCML stock and half of Scrantom's residual interests in Juridica case investments, which are known as "come along rights."

38. Pursuant to the terms of the Amended PA, Masters was obligated to pay Balance Point a minimum of $1,077,750, exclusive of interest, which represents 25 percent of the minimum value of the marital property that Masters was entitled to receive pursuant to the Divorce Settlement.

10

39. After entering into the Divorce Settlement with Masters, Scrantom intentionally and wrongfully attempted to persuade Masters that she should not pay Balance Point because her agreement with Balance Point was not enforceable, even though it was valid and enforceable. For example, in May 2012, Scrantom reached out to an attorney on Masters' behalf with the specific intent of having the attorney render a legal opinion to Masters that her funding agreement was Balance Point was not enforceable. (The attorney declined to render such an opinion to Masters.)

40. Scrantom also attempted to convince Masters that neither her divorce attorneys nor Balance Point were acting in her best interests and that she should not pay them. For example, on May 27, 2012, after Masters forwarded Scrantom an invoice sent by one of her divorce attorneys to Napp, Scrantom responded via email that same day and told Masters, "Interesting—Parker [Masters' divorce attorney] is telling Stacy "here is a copy of YOUR bill." Who's the client? Got more of this stuff?"

41. In breach of the Amended PA, and as a direct and proximate result of Scrantom's intentional and improper efforts to persuade Masters to breach her agreements with Balance Point, Masters has refused to pay Balance Point **any amount** of money in consideration of Balance Point providing financing in the amount of $310,435 to cover the legal fees and expenses that Masters incurred in connection with the Divorce Proceedings.

42. As a result of Masters' breach of the PA and her refusal to pay Balance Point any amount of money that it is owed, Balance Point was forced to commence litigation against Masters in the District of Montana.

43. Scrantom also persuaded Masters to breach the Confidentiality Agreements by asking Masters to send him copies of the confidential agreements that Masters entered into with

11

Balance Point. Masters often sent confidential materials pertaining to Balance Point to Scrantom's email address and fax number at BlackRobe, which has its principal place of business in New York, New York. For example, on May 10, 2012, a BlackRobe employee received a fax from Masters to Scrantom that contained a copy of the confidential Amended PA executed by Masters and the accompanying exhibits, which was then forwarded to Scrantom via email later that day.

44. As someone with years of experience in the litigation funding industry, Scrantom knew that the agreements that Masters had entered into with Balance Point were confidential and constituted trade secrets. The Amended PA reflected Balance Point's unique and confidential business strategies for designing optimal financing plans for both itself and its clients. The Amended PA, and the underlying policies and procedures, were developed by Balance Point over more than a year and at considerable expense. Balance Point retained attorneys, accountants and other professionals and spent hundreds of thousands of dollars to develop the financing strategies outlined in the Amended PA. This information would be especially helpful and beneficial to anyone in the litigation funding business.

45. Balance Point went to great lengths to preserve the confidentiality of its agreements. Balance Point did not disclose its agreements to the public and only allowed its small number of employees to have access to them. Balance Point would not allow its clients to view the confidential agreements until they signed a strict confidentiality agreement. The clients' attorneys were also required to sign a confidentiality agreement prior to being permitted to review Balance Point's agreements.

46. Scrantom also caused Masters to breach the Payment Instructions. Despite receiving the Amended PA on May 10, 2012, and therefore knowing that the Payment

12

Instructions required all Divorce Settlement payments to be paid to Masters' divorce attorneys, Scrantom, on June 14, 2012, wired the initial Divorce Settlement payment of $719,000 directly to Masters' account.

47. In furtherance of his attempts to interfere with Masters' contractual relationship with Balance Point, Scrantom encouraged and persuaded Masters not to pay her divorce attorneys a substantial amount of fees owed and explore baseless legal malpractice actions against her divorce attorneys.

48. As a result of Scrantom's interference, Masters stopped cooperating with her divorce attorneys. In June 2012, Masters' divorce attorneys expressed their concerns that Masters had "reached some side agreement with Tim [Scrantom]." One of Masters' divorce attorneys further advised Masters that he suspected that Masters was using the secret arrangement with Scrantom "to try to avoid the obligations [she has] to the attorneys and others who have provided [her] with service over the past several years."

49. On June 10, 2012, Scrantom sent an email to Masters and told her, "The disputes with Balance [P]oint and your lawyers may go on for a while, although I would think if the right level of **threat** is brought against them, it can be over relatively quickly" (emphasis added).

### COUNT I
### Tortious Interference with Contract – All Defendants

50. Balance Point repeats and realleges the allegations set forth in paragraphs 1 through 49 hereof as if set forth fully herein.

51. At various times in 2011, Masters and Balance Point entered into several valid contracts in connection with Masters retaining Balance Point to provide financing for the litigation expenses Masters would incur in connection with the Divorce Proceedings. The valid

contracts included, *inter alia*, the Amended PA, the Payment Instructions, and the Confidentiality Agreements.

52. Scrantom received copies of the valid contracts that Masters entered into with Balance Point, and therefore knew that the contracts existed. Juridica learned that there was a contractual relationship between Balance Point and Masters as a result of various correspondence sent by Balance Point's attorneys to Juridica's officers.

53. Defendants intentionally and improperly induced Masters to breach the Balance Point contracts by, *inter alia*, threatening to initiate litigation against Balance Point, persuading Masters that her funding agreement with Balance Point was not enforceable, convincing Masters that neither Balance Point nor her divorce attorneys were working in her best interests, persuading Masters to disclose her confidential agreements with Balance Point to Scrantom, and making Divorce Settlement payments to Masters directly rather than her divorce attorneys. Defendants had no proper justification to interfere with Balance Point's contractual relationship with Masters.

54. As a direct and proximate result thereof, Masters has refused to pay Balance Point 25 percent of the marital property that she was entitled to receive pursuant to the Divorce Settlement, which was worth a minimum of $4,310,000. Balance Point has also incurred a substantial amount of attorneys' fees and other costs and expenses as a result of having to commence a lawsuit against Masters for breach of contract in the District of Montana.

55. As a result of the foregoing, Balance Point is entitled to compensatory damages of not less than $1,077,750, pre-judgment interest, attorneys' fees, and costs in an amount to be determined at trial.

56. Balance Point is also entitled to punitive damages in an amount to be determined at trial based on Scrantom's intentional interference with Balance Point's agreements with Masters. In light of Scrantom's status as an attorney and barrister and his significant experience in the litigation financing industry, his misconduct is particularly egregious and demonstrates a high degree of moral turpitude and utter disregard for the contractual rights of Balance Point. Scrantom acted maliciously and with an improper motive of harming a competing business. Upon information and belief, Juridica is equally liable for punitive damages because, at all relevant times, Scrantom was acting as an agent of Juridica, and Juridica was aware of and acquiesced to Scrantom's misconduct.

## COUNT II
### Tortious Interference with Business Relations – All Defendants

57. Balance Point repeats and realleges the allegations set forth in paragraphs 1 through 56 hereof as if set forth fully herein.

58. In December 2011, Balance Point had a business relationship with Asta to provide equity funding for Balance Point.

59. As knowledgeable and experienced participants in the litigation funding industry, Defendants were aware that litigation funding corporations must constantly secure investments from third parties (as they do) in order to operate. Therefore, Defendants knew that Balance Point would be in frequent negotiations with prospective investors. Moreover, in email correspondence with Scrantom, Masters indicated that Scrantom was aware that Balance Point was negotiating an equity funding arrangement with Asta and attempted to interfere with it by threatening to bring litigation against Balance Point on behalf of Juridica.

60. As experienced and knowledgeable participants in the litigation funding industry, Defendants knew that Balance Point would have to disclose Defendants' threats of litigation to

15

7167843.6

prospective investors, including Asta. Therefore, Defendants knew that their threats would be received by any prospective investor that was in negotiations with Balance Point, including Asta.

61.     Defendants intentionally interfered with Balance Point's business relationship with Asta by threatening to commence baseless and harassing litigation against Balance Point.

62.     Defendants knew that their threats were entirely meritless and that their threats would harm Balance Point's ability to obtain equity funding from Asta upon favorable terms. Therefore, Defendants acted solely out of malice, and used dishonest, unfair and improper means to interfere with Balance Point's business relations with Asta.

63.     As a direct and proximate result of Defendants' threats to commence baseless and harassing litigation against Balance Point, and Balance Point fulfilling its obligations to disclose the threatened litigation to Asta, Balance Point's negotiations with Asta have been directly and negatively impacted.

64.     As a result of the foregoing, Balance Point is entitled to compensatory damages, pre-judgment interest, attorneys' fees, and costs in an amount to be determined at trial.

65.     Balance Point is also entitled to punitive damages in an amount to be determined at trial based on Scrantom's intentional interference with Balance Point's business relationship with Asta. In light of Scrantom's status as an attorney and barrister and his significant involvement in the litigation financing industry, his misconduct is particularly egregious and demonstrates a high degree of moral turpitude and utter disregard for the rights of Balance Point, a competitor of Scrantom and Juridica. Scrantom acted maliciously and with an improper motive of harming a competing business. Upon information and belief, Juridica is equally liable for punitive damages because, at all relevant times, Scrantom was acting as an agent of Juridica, and Juridica was aware of and acquiesced to Scrantom's misconduct.

### COUNT III
### Misappropriation of Trade Secrets and Confidential Information – Scrantom

66. Balance Point repeats and realleges the allegations set forth in paragraphs 1 through 65 hereof as if set forth fully herein.

67. At all relevant times, the agreements entered into by Masters and Balance Point constituted proprietary, confidential trade secrets belonging to Balance Point.

68. Balance Point's funding strategies and trade secrets are evidenced in the Original PA, the Amended PA and other confidential documents, and Balance Point goes to great lengths to maintain the confidentiality of its trade secrets.

69. Scrantom procured Balance Point's confidential agreements through improper means. Specifically, Scrantom improperly induced Masters to breach her Confidentiality Agreements with Balance Point and disclose to Scrantom the terms and conditions of her confidential agreements with Balance Point.

70. As a result of the foregoing, Balance Point is entitled to compensatory damages, pre-judgment interest, attorneys' fees, and costs in an amount to be determined at trial.

71. Misappropriation of Balance Point's confidential and trade secret information will also cause Balance Point irreparable harm and Balance Point is entitled to a permanent injunction barring the misuse of Balance Point's proprietary and confidential and trade secret information.

72. Balance Point is also entitled to punitive damages in an amount to be determined at trial based on Scrantom misappropriating trade secrets from Balance Point, a competitor of Scrantom and Juridica in the litigation-financing industry. In light of Scrantom's status as an attorney and barrister and his significant involvement in the litigation financing industry, his misconduct is particularly egregious and demonstrates a high degree of moral turpitude and utter disregard for the confidentiality of Balance Point's valuable trade secrets and proprietary

information. Scrantom acted maliciously and with an improper motive of harming a competing business.

## PRAYER FOR RELIEF

WHEREFORE, Balance Point prays for relief and judgment against Defendants as follows:

    A.    Entering judgment for Balance Point and against Defendants on Counts I, II, and III;

    B.    Awarding Balance Point damages in an amount to be determined at trial, but not less than $1 million, exclusive of interest and attorneys' fees;

    C.    Awarding Balance Point pre-judgment and post-judgment interest, and attorneys' fees;

    D.    Awarding Balance Point punitive damages in an amount to be determined at trial;

    E.    Issuing a permanent injunction barring the misuse of Balance Point's proprietary and confidential and trade secret information; and

    F.    Granting such other and further relief as is just and proper.

## JURY DEMAND

Balance Point hereby demands a trial by Jury.

Dated: March 18, 2013

CARTER LEDYARD & MILBURN LLP

By _____
Judith A. Lockhart
lockhart@clm.com
Andriy R. Pazuniak
pazuniak@clm.com
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for Plaintiffs Balance Point Divorce Funding, LLC*